# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

      **Plaintiff,**

      **v.**                                                     **Case No. 11-CV-777**

REXNORD INDUSTRIES, LLC,

      **Defendant.**

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, Equal Employment Opportunity Commission ("EEOC"), alleges that the Defendant, Rexnord Industries, LLC ("Rexnord"), fired its employee, Danielle Sullivan ("Sullivan") either because it regarded her as disabled (by a seizure disorder) or because of her disability (migraines). (Complaint ¶ 9, Docket # 1.) On March 15, 2013, Rexnord filed a motion for summary judgment. (Docket # 66.) For the reasons that follow, Rexnord's motion for summary judgment is denied.

### SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

### UNDISPUTED FACTS

The EEOC seeks relief in this action on behalf of Danielle Sullivan, a former employee of Rexnord, who worked as an assembler from June 30, 2008 until her termination on May 15, 2009. (Defendant's Proposed Findings of Fact "DPFOF" ¶ 4.) As an assembler, Sullivan was required to use air tools, power tools, and hand tools. (*Id.* ¶ 18.) Sullivan's position included the ability to regularly lift and/or move up to 10 pounds, frequently lift and/or move up to 25 pounds, and occasionally lift and/or move up to 50 pounds. (*Id.* ¶ 19.) Sullivan worked on the "87" assembly line, which assembled brakes weighing anywhere from 30 to 110 pounds, and the "56" assembly line, which assembled brakes weighing between 20 and 35 pounds. (*Id.* ¶ 23.) The tables making up the assembly lines had sharp edges and corners. (*Id.* ¶ 25.) Forklift lanes run along the assembly lines at which Sullivan worked. (*Id.* ¶ 27.)

-2-

On October 16, 2008, Sullivan had a headache at work and "wasn't feeling good," so she went to the restroom, got a drink of water, and sat on one of the toilets "to kind of feel what was going on." (*Id.* ¶ 32.) Sullivan sat down because she had a spinning feeling. (*Id.* ¶ 33.) Sullivan testified that she had a "little blackout that lasted maybe two seconds" at which time she hit her head in the bathroom stall. (*Id.* ¶ 34.) Sullivan was taken from Rexnord on a stretcher and then went to Aurora St. Luke's South Shore by ambulance. (*Id.* ¶ 35.) In October 2008, Sullivan told Lindsey Usher ("Usher"), Human Resources Manager, that she was being evaluated for a possible seizure disorder and that her health care providers did not know what was going on. (*Id.* ¶ 43.)

Sullivan applied for Short Term Disability benefits to cover her absence from work during this time period and she described her disability as "illness - epilepsy? - seizures/blackouts." (*Id.* ¶ 44.) One of Sullivan's treating physicians, Dr. Terry Spears-Barnett, provided a certification in support of Sullivan's application for Short Term Disability benefits, in which she stated that Sullivan had "active seizure," and attested that Sullivan was "unable [to] operate machinery or drive until seen by Neurologist." (*Id.* ¶ 45.) However, Dr. Spears-Barnett also testified that she had "no recollection of [Sullivan] being diagnosed with a seizure disorder, and you don't want to give somebody that label without some further documentation." (Deposition of Dr. Spears-Barnett ("Spears-Barnett Dep." at 19, del Peral Decl. ¶ 12, Ex. K, Docket # 86-5.) Dr. Spears-Barnett clarified that she wrote "active seizure" on Sullivan's form because she "had exhibited certain symptoms more than once" and while she diagnosed Sullivan with "possible" seizure disorder, the diagnosis was not "definite." (Spears-Barnett Dep. at 25.)

Sullivan saw Dr. Robert Goldman, a neurologist, on October 29, 2008. (DPFOF ¶ 47.) Dr. Goldman noted that Sullivan had "blackouts" since age 13, the blackouts last a few seconds or so,

-3-

and she occasionally will fall. (*Id.*) Dr. Goldman provided Sullivan with an excuse from work through November 3, 2008, which Sullivan provided to Usher. (*Id.* ¶ 49.) On November 4, 2008, Sullivan went to the emergency room because she was "blacking out, throwing up." (*Id.* ¶ 53.) She was excused from work through November 6, 2008. (*Id.*)

On November 24, 2008, Sullivan went to an Urgi Med Clinic complaining of "[s]evere headaches and epilepsy." (*Id.* ¶ 56.) Sullivan was excused from work from November 24 through November 26, 2008. (*Id.*) On December 4, 2008, Sullivan left work early because she had a headache and "just wasn't feeling good" and she went to the emergency room. (*Id.* ¶ 57.) Sullivan was excused from work from December 4 until December 8, 2008. (*Id.* ¶ 60.) Sullivan returned to see Dr. Goldman on January 7, 2009, who increased the dosage of her prescription for Gabapentin, an anticonvulsant that also can be used to treat pain, which she claimed had helped alleviate her symptoms. (*Id.* ¶ 61.)

On January 9, 2009, Sullivan left work early because she had a headache and was dizzy and lightheaded. (*Id.* ¶ 64.) On April 22, 2009, Sullivan was again found ill in the bathroom and was taken away from work by ambulance. (*Id.* ¶ 65.) Sullivan was excused from work from April 22 until April 24, 2009. (*Id.* ¶ 67.)

Sullivan underwent a fitness for duty examination with Dr. Andrew Seter on May 11, 2009. (*Id.* ¶ 80.) On May 14, 2009, Dr. Seter gave Rexnord a written opinion regarding Sullivan's fitness for duty in which he stated that Sullivan had an active seizure disorder which was currently under treatment, that her active seizure disorder created a direct safety risk to herself and others, and that he did not recommend that she return to work until her medical condition was fully stabilized. (*Id.* ¶ 85.) On May 15, 2009, Usher sent Sullivan a letter terminating her employment. (*Id.* ¶ 96.)

-4-

## DISCUSSION

*1.     Standard under the ADA*

The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating against a qualified individual with a disability. *See* 42 U.S.C. § 12112(a); *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669 (7th Cir. 2000). To establish disability discrimination, a plaintiff must show that she is disabled within the meaning of the ADA, that she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that she suffered from an adverse employment action because of her disability. *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005). A plaintiff can establish that she is disabled by showing (1) that she has a physical or mental impairment that substantially limits her in one or more major life activities; (2) that she has a record of such an impairment; or (3) that the employer regarded her as having such an impairment. 42 U.S.C. § 12102(2).

If an ADA plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the employment decision. If the employer succeeds, then the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual. *Nese*, 405 F.3d at 641.Under the ADA, an employee has available two methods for establishing that her employer discriminated against her based on her disability. *Bekker*, 229 F.3d at 670. First, the employee may present direct or circumstantial evidence that the employment decision was motivated by the employer's discriminatory animus. *Id.* Second, the employee may use the burden-shifting method set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), to prove by indirect evidence that her employer intentionally discriminated against her. *Id.*

-5-

In this case, the EEOC argues Rexnord discriminated against Sullivan because it regarded her as disabled due to a perceived seizure disorder. Rexnord has assumed for purposes of this motion that Sullivan's alleged seizure disorder constitutes a "regarded as" disability under the ADA. (Def.'s Br. in Supp. Mot. for Summ. Judg. "Def.'s Br." at 6 n.2, Docket # 67.) Thus, the issues before the court are whether Sullivan is qualified to perform the essential functions of her job either with or without reasonable accommodation and whether she suffered from an adverse employment decision "because of" her disability.

Rexnord argues Sullivan is not a qualified individual under the ADA for several reasons. First, Rexnord claims Sullivan's alleged seizure disorder made her a "direct threat" to the safety of herself and those around her. Second, Rexnord argues that representations Sullivan made to the Social Security Administration in applying for benefits negates her status as a qualified individual. And third, Rexnord argues that Sullivan's numerous absences from work made her unqualified. I will address each in turn.

2.    *Direct Threat*

An individual is not qualified under the ADA if she presents a "direct threat" to her own health and safety or that of others. *See Bekker*, 229 F.3d at 670. The determination that she poses a direct threat must be premised upon "a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individual-ized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (citing 29 C.F.R. § 1630.2(r) (internal quotations omitted)). The determination that a significant risk exists must also be objectively reasonable. *Bragdon v. Abbott*, 524 U.S. 624, 649–50 (1998). To determine whether a risk is

-6-

significant, the employer must consider: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r); *see also Chevron*, 536 U.S. at 86; *Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001).

### 2.1 Burden of Proof

To begin, the parties dispute who bears the burden of proof of direct threat. While Rexnord argues the Seventh Circuit has made conflicting statements on whether the plaintiff or the defendant bears the burden of proof on the issue of direct threat, it states that the court need not resolve this issue for purposes of this motion because the facts establish the existence of a direct threat under either proof allocation. (Def.'s Br. at 7 n.3.) The EEOC argues *Branham v. Snow*, 392 F.3d 896, 906-07 (7th Cir. 2004) held that the employer bears the burden to establish direct threat. (Pl.'s Br. in Opp. to Summ. Judg. ("Pl.'s Br.") at 14-17, Docket # 83.)

In *Branham*, the Seventh Circuit states that it is the employer's burden to show that an employee posed a direct threat to workplace safety that could not be eliminated by a reasonable accommodation. 392 F.3d at 907. In a footnote, the court acknowledges a dispute among the circuits regarding the burden of proof with respect to the question of whether an employee poses a direct threat to his own safety or that of others. *Id.* at 907 n.5. In its discussion, the court cites circuits that find the employer bears the burden of proof as well as circuits where the plaintiff bears the burden of proof where essential job functions necessarily implicate the safety of others. *Id.* After discussing these various approaches, the court states that "[w]e see no reason to revisit the established law of this circuit in this case. Our earlier decision finds support in the plain wording of the statute and in common sense. The [employer] is certainly in the best position to furnish the court with a complete

-7-

factual assessment of both the physical qualifications of the candidate and of the demands of the position. Here, the [employer] simply has not met that burden." *Id.* Thus, Rexnord bears the burden of proving Sullivan was a direct threat. Further, in order to prevail on its summary judgment motion asserting Sullivan posed a direct threat, Rexnord must show that the evidence on the question of direct threat is so one-sided that no reasonable jury could find for Sullivan. *See id.*

### 2.2    Reliance on Dr. Seter's Opinion

Regarding direct threat, there are genuine disputes of material fact regarding the reasonableness of Rexnord's reliance on the medical opinion of its fitness for duty doctor, Dr. Seter, as well as on whether Sullivan's risk was significant. As previously stated, the determination that an employee poses a direct threat must be premised upon "a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence . . . ." *Echazabal*, 536 U.S. at 86. Rexnord argues it relied on the most current medical knowledge and best available objective evidence in making its direct threat determination, specifically by relying on the fitness for duty report of Dr. Seter, Sullivan's emergency departure from the plant on two occasions by ambulance, her presentation of work excuses from hospital emergency rooms, her representations that she had seizures, her receipt of disability benefits for "active seizures," her claims of dizziness, and her repeated absences from work. (Def.'s Br. at 11.)

While Rexnord's reliance on Sullivan's departure from Rexnord by ambulance, presentation of work excuses, receipt of disability benefits, absences from work, and her representations of her medical condition are relevant to whether Rexnord made an individualized assessment of Sullivan's

-8-

ability to safely perform the essential functions of the job,[1] these are not medical judgments. The only medical judgment on which Rexnord relies is Dr. Seter's opinion. Dr. Seter opines that Sullivan was a direct threat to workplace safety due to an active seizure disorder. However, the EEOC has presented conflicting evidence from its expert, Dr. George Morris, who opines that Dr. Seter relied on improper methodology in diagnosing Sullivan's condition. (Dr. Morris Expert Report, Nigh Decl. ¶ 4, Ex. C, Docket # 95-3.) Thus, the EEOC contests whether Dr. Seter's evaluation relied on the most current medical knowledge and/or on the best available objective evidence and in turn whether it was objectively reasonable for Rexnord to rely on Dr. Seter's evaluation in determining Sullivan was a direct threat. The applicable regulations and interpretive caselaw require the evaluation of professional opinions upon which the employer relied. *See Bragdon*, 524 U.S. at 650 (finding that whether an employer's employment decision was reasonable in light of available medical evidence requires that courts "assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments . . ."). Accordingly, there is a genuine issue of material fact that precludes summary judgment on this issue.

### 2.3 Duration of the Risk

Further, there is a dispute of material fact as to whether Sullivan's risk is significant. Regarding the first factor, duration of the risk, the parties seem to dispute whether "duration of the risk" applies to the duration of the medical condition itself or the duration of the seizures. Rexnord argues Sullivan's seizures could continue for an indefinite period of time and her incapacity had no known end date (Def.'s Br. at 12); whereas, the EEOC argues Sullivan's episodes lasted only seconds

---

[1] While the EEOC contests the adequacy of Rexnord's assessment of Sullivan's ability to safely perform her job by criticizing its reliance on Dr. Seter's opinion, the EEOC does not seem to contest whether Rexnord made an individualized assessment, as required by 29 C.F.R. § 1630.2(r). (*See* Pl.'s Br. at 18-20.)

and she responded to them promptly (Pl.'s Br. at 21.) Generally speaking, if the risk is not controlled or controllable, the duration is indefinite and thus would weigh more heavily in favor of a finding of direct threat. *See School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 288 (1987) (defining "duration of the risk" as "how long is the carrier infectious" in an employee with tuberculosis); *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 661 (7th Cir. 2005) (upholding district court's finding that employee with uncontrolled diabetes was a direct threat); *Emerson*, 256 F.3d at 514 (in finding a direct threat, the court considered the fact the plaintiff's anxiety attacks may disappear in one to two years, but might never improve); *Bekker*, 229 F.3d at 671 (in finding a direct threat, plaintiff's alcoholism was persistent and continued despite treatment); *see also Wurzel v. Whirlpool Corp.*, No. 10-3629, 2012 WL 1449683, *15 (6th Cir. Apr. 27, 2012) (in upholding summary judgment for employer on direct threat issue, the court considered the fact the plaintiff's condition of Prinzmetal angina, which causes spasms, was "life-long," his physicians had not yet achieved control over his condition, and there was no indication that they would); *Jarvis v. Potter*, 500 F.3d 1113, 1124 (10th Cir. 2007) (in upholding summary judgment for employer on direct threat issue, the court considered the fact the plaintiff's Post Traumatic Stress Disorder would last indefinitely); *Hutton v. Elf Atochem North America Inc.*, 273 F.3d 884, 894 (9th Cir. 2001) (in upholding summary judgment for employer on direct threat issue, finding duration of risk would exist for as long as diabetic plaintiff held the job of chlorine finishing operator; however, evidence existed in the record that the plaintiff's diabetes was not well controlled); *but see Branham*, 392 F.3d at 907 (finding duration of risk insignificant in diabetic plaintiff who tests blood sugar several times a day, has exceptional control over blood glucose levels, and has full awareness of his reactions allowing him to respond promptly to low blood sugar levels).

-10-

When seizures are causing the risk of harm, courts have considered the length of the seizure itself, among other things, in determining the duration of the risk. *See Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 220 (2nd Cir. 2001) (in determining employee was not a direct threat, the court considered the fact plaintiff's seizures "usually last a few minutes or less"); *EEOC v. Kinney Shoe Corp.*, 917 F. Supp. 419, 429 (W.D. Va. 1996) (in finding employee was not a direct threat, the court found the duration of the risk is "fleeting" because the risk of injury stems from a split-second event of the plaintiff falling to the floor from a seizure); *but see Olsen v. Capital Region Medical Center*, No. 10-4221, 2012 WL 1232271, *7 (W.D. Mo. Apr. 12, 2012) (in finding employee was a direct threat, the court considered the fact the plaintiff's "seizures lasted long enough to cause her to lose consciousness for a period of several minutes").

There is a dispute of fact as to whether Sullivan was actually experiencing seizures. While Dr. Seter opined Sullivan was experiencing an active seizure disorder (Fitness for Duty Report, del Peral Decl. ¶ 28, Ex. AA, Docket # 88-7), several of Sullivan's treating physicians were unwilling to make that diagnosis (Spears-Barnett Dep. at 19, Deposition of Dr. Robert Goldman at 64 ("Goldman Dep."), del Peral Decl. ¶ 18, Ex. Q, Docket # 87-4). Further, Sullivan also testified that she reported to Dr. Seter that she was experiencing blackouts, not seizures. (Deposition of Danielle Sullivan ("Sullivan Dep.") at 137, Nigh Decl. ¶ 19, Ex. R, Docket # 69-18.) Thus, it is disputed whether Sullivan was actually experiencing seizures as opined by Dr. Seter, and Rexnord relied on Dr. Seter's report that Sullivan's seizure disorder was active and indefinite. (DPFOF ¶ 94.)

Further, there is conflicting evidence as to whether Sullivan was treating her alleged seizure disorder. Dr. Seter's May 11, 2009 report indicated Sullivan was under the treatment of Dr. Goldman, a neurologist, and her last appointment with him was May 7, 2009. (*Id.* ¶ 82.) Sullivan

-11-

testified that she had an appointment with Dr. Goldman on May 7, 2009 and he released her to go back to work. (Sullivan Dep. at 119.) Dr. Goldman testified that he did not see Sullivan after January 7, 2009. (Goldman Dep. at 18, Nigh Decl. ¶ 4, Ex. C, Docket # 69-3.)

Finally, there is conflicting evidence as to whether Sullivan lost consciousness during the two incidents at Rexnord, and if so, for how long. In his report, Dr. Seter stated that Sullivan lost consciousness for an uncertain duration. (DPFOF ¶ 82.) Sullivan testified that she never lost consciousness, (Sullivan Dep. at 132) or if she did lose consciousness, it was "maybe two seconds" when she experienced the "little blackout" (*id.* at 56). Because there is conflicting evidence as to whether Sullivan was controlling her medical condition and whether she was actually becoming unconscious at work and if so, for what duration, the record has created a genuine issue of triable fact as to the duration of the risk.

### 2.4    Nature and Severity of Harm

Regarding the second factor, nature and severity of the potential harm, Rexnord argues Sullivan's seizure episodes, which resulted in an unexpected loss of consciousness, presented a risk of serious harm, such as dropping a heavy metal part on herself or on a co-worker, hitting her head on a long metal table with a sharp edge, exposure to moving mechanical parts and risk of electric shock, and working around moving forklifts. (Def.'s Br. at 12-13.) The EEOC counters that Sullivan never suffered any injury at Rexnord and Rexnord relies on generalized statements of potential harm. (Pl.'s Br. at 23-24.)

Rexnord presents testimony from Dr. Seter that "anytime an individual loses consciousness especially if they have no warning of that event, that loss of consciousness can put them into a risky situation." (Deposition of Dr. Andrew Seter at 138 ("Seter Dep."), Nigh Decl. ¶ 12, Ex. K, Docket # 69-11.) Dr. Seter characterized Sullivan's work environment as generally dangerous. Specifically,

-12-

she works in front of a hard desk and floor and works with power tools. (*Id.* at 139.) Dr. Seter opined that if Sullivan lost consciousness, especially if she lost consciousness with no warning, that could "put [her] in a risky situation." (*Id.* at 138.) Specifically, she could hit her head and sustain a head injury, laceration, bone fracture, strain, or contusion. (*Id.* at 139.) If she lost consciousness in front of a forklift or was on a ladder, she could face injury. (*Id.*) Because of the work environment, she risked significant injury or death. (*Id.*) The EEOC counters Dr. Seter's opinion by stating that it is incorrectly premised on the assumption that Sullivan unexpectedly lost consciousness, because Sullivan went to the restroom during both incidents when she felt them coming on.

It is undisputed Sullivan works in a potentially dangerous environment that includes working at tables with sharp edges and corners (DPFOF ¶ 25) and working around forklifts (*id.* ¶ 27). However, the risks Dr. Seter presents rest on the premise that Sullivan would unexpectedly lose consciousness, or at the very least would lose consciousness, whether unexpected or not. Sullivan testified that she told Dr. Seter that she could feel the blackouts coming on and that is why she would either go to the restroom or tell Mary Sobczak, the SAB Production Supervisor, that she was not feeling well. (Sullivan Dep. at 138.) Sullivan further testified that she did not lose consciousness during the "blackout." (*Id.* at 132.) As such, the record has created a genuine issue of triable fact as to the nature and severity of the harm caused by Sullivan's medical condition.

### 2.5 Likelihood of Harm

Regarding the third factor, likelihood of potential harm, Rexnord argues that the likelihood of potential harm is great because had she lost consciousness in the work areas of the plant, she could have suffered serious bodily harm or even death. (Def.'s Br. at 14.) Further, Rexnord argues the fact Sullivan had two on-the-job incidents, one of which involved hitting her head, that caused her to

-13-

leave work in an ambulance and to be off work for substantial periods of time, confirm the likelihood of harm. The EEOC counters that Sullivan's episodes at Rexnord did not result in injury and she was taking steps to control her condition. (Pl.'s Br. at 24-25.)

In determining likelihood of potential harm, courts have looked at such considerations as the type of injury experienced, *Kinney Shoe*, 917 F. Supp. at 429 (finding likelihood of potential harm relatively minor given complete absence of history of injury during seizure, where the worst injury was a bump or scratch); the number of times the event occurred, *Emerson*, 256 F.3d at 514 (plaintiff suffered two panic attacks at work), *Branham*, 392 F.3d at 908 (likelihood of harm low because risk of suffering hypoglycemic reaction was 0.2% per year); *Olsen*, 2012 WL 1232271, at *7 (plaintiff experienced fourteen seizures over a two year period); the dangerousness of the work environment, *Wurzel*, 2012 WL 1449683, at *15 (likelihood of harm factor met when employee works in dangerous job environment and was found close to passing out in one instance and needed assistance from fellow employees numerous times); and whether the condition is uncontrolled, *Darnell*, 417 F.3d at 662 ("[W]here the plaintiff's medical condition is uncontrolled, of an unlimited duration, and capable of causing serious harm, injury may be considered likely to occur.").

As to this factor, some of the material facts remain in dispute. It is undisputed Sullivan works in a potentially dangerous environment and suffered two incidents while at work. It is also undisputed Sullivan hit her head during the October 16, 2008 incident (*id.* ¶ 34) and was given a CT scan because of the fall (Nigh Decl. ¶ 20, Ex. S, Docket # 69-19). While the parties disagree on whether she was "injured" from this fall, it appears any injury sustained was minor as the results of her CT scan indicate "[n]o acute intracranial event" (*id*). Despite the agreement that two incidents occurred, the nature of these incidents is disputed. For example, as previously stated, Sullivan

-14-

testified that she did not lose consciousness during the "blackout" (Sullivan Dep. at 132) whereas Dr. Seter testified Sullivan did lose consciousness (DPFOF ¶ 82).

Further, as stated above, there is conflicting evidence as to whether Sullivan was treating her condition and thus whether the condition was under control.

### 2.6 Imminence of Harm

Finally, regarding imminence of the potential harm, Rexnord argues Sullivan's seizure disorder presented an imminent safety threat because her seizures were uncontrolled, she could not anticipate when the seizures would occur, and that the uncertainty scared her. (Def.'s Br. at 15-16.) The EEOC argues that Sullivan was able to predict her blackouts and control their outcomes by going to a safe place. (Pl.'s Br. at 25.) As discussed previously, whether Sullivan's medical condition was controlled and whether Sullivan could predict her "blackouts" is in dispute. As such, summary judgment is not appropriate.

### 2.7 Reasonable Accommodation

Lastly, Rexnord argues that if an employee presents a direct threat as the result of an actual disability, the employer must generally consider whether the threat could be eliminated or reduced by a reasonable accommodation. (Def.'s Br. at 17.) However, Rexnord states that in cases involving a "regarded as" disability, an employer has no duty to accommodate. (*Id.*) Although Rexnord has not cited, and this court has not found, any controlling authority directly addressing this issue in the context of a direct threat analysis, the Sixth Circuit, in addressing a direct threat claim, stated that the plaintiff, in bringing a "regarded as" claim, would not be entitled to the benefit of a reasonable accommodation. *Wurzel*, 2012 WL 1449683, at *9 n.13. *See also Hoback v. City of Chattanooga*, No. 10-CV-74, 2012 WL 3834828, *5 (E.D. Tenn. Sept. 4, 2012) (citing *Wurzel*, 2012 WL 1449683, at *9

-15-

n.13) ("A plaintiff in a 'regarded as' claim is also not entitled to reasonable accommodation in the direct threat determination.").

While this court notes that in *Bekker* the Seventh Circuit did address the reasonable accommodation part of the direct threat analysis in the context of a plaintiff with a "regarded as" claim, this case was decided prior to the amendments to the ADA that clarified that employers need not provide reasonable accommodation to a "regarded as" individual. 42 U.S.C. § 12201(h); *see also Majors v. General Elec. Co.*, 714 F.3d 527, 535 n.4 (7th Cir. 2013) ("The amendments to the ADA clarified that employers needn't provide reasonable accommodation to a 'regarded as' disabled individual."). Although not directly addressing whether this applies in the context of a direct threat analysis, it stands to reason that a plaintiff in a "regarded as" claim is also not entitled to reasonable accommodation in the direct threat determination. As such, whether Rexnord provided a reasonable accommodation is not considered in the court's direct threat analysis.

3.      *Sullivan's SSDI Application*

Rexnord argues Sullivan's representations to the Social Security Administration on her application for benefits refutes her status as a "qualified individual" under the ADA. Rexnord argues because Sullivan stated on her application that she could not work as of May 15, 2009 because of epilepsy and depression, that she is not a qualified individual. Rexnord relies on the Supreme Court's decision in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999) in support of its position.

The issue in *Cleveland* was whether an applicant's successful pursuit of SSDI benefits either estops her from pursuing an ADA claim or triggers a presumption that she is unable to perform the essential functions of her job. *Id.* at 797; *Lee v. City of Salem*, 259 F.3d 667, 673 (7th Cir. 2001). The *Cleveland* Court held that "these two seemingly divergent statutory contentions are often consistent,

-16-

each with the other. Thus pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." 526 U.S. at 797. However, the Court further found that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation. *Id.* at 806. The Court stated that:

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Id.* at 807. As Rexnord acknowledges, there is one vital difference between the plaintiff in *Cleveland* and Sullivan. Sullivan did not succeed in obtaining SSDI benefits. The *Cleveland* Court recognized the important distinction between an application for SSDI benefits and an award of benefits:

> [I]f an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system. Our ordinary rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to "set forth two or more statements of a claim or defense alternately or hypothetically," and to "state as many separate claims or defenses as the party has regardless of consistency." Fed. Rule Civ. Proc. 8(e)(2). We do not see why the law in respect to the assertion of SSDI and ADA claims should differ.

*Id.* at 805.

Because Sullivan's application for SSDI benefits was rejected, this case falls under the "pleading in the alternative" explanation posited by the *Cleveland* Court which requires Sullivan to explain how her statement of "disability" in support of her application for SSDI benefits is consistent with the position taken in this case that she is capable of performing her job at Rexnord. Sullivan testified that at the time she applied for SSDI she felt she could not work; however, she understood

-17-

that if anything changed and she subsequently believed she could work, she would not be entitled to benefits. (Sullivan Dep. at 161-62.) Sullivan also testified that she applied for benefits because she was being told by Dr. Seter that she should apply to help her family and she was able to work again even before she received a decision from the Social Security Administration. (*Id.* at 154, 161.) A jury can evaluate what this apparent inconsistency means for the ADA claim. Accordingly, Rexnord is not entitled to summary judgment on this ground.

    4.    *Absences*

Rexnord contends Sullivan's numerous absences from work make her unqualified under the ADA. Rexnord argues Sullivan's job as an Assembler at Rexnord required her to show up for work and Sullivan missed over twenty-two work days from June 30, 2008 to April 24, 2009. (Def.'s Br. at 23.) While it is true that "in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability" and "[t]he fact is that in most cases, attendance at the job site is a basic requirement of most jobs," *E.E.O.C. v. Yellow Freight System, Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (internal citation and quotation omitted), it is also true that the Seventh Circuit has not "establish[ed] a hard-and-fast rule that no absences from work need be tolerated," *Waggoner v. Oiln Corp.*, 169 F.3d 481, 485 (7th Cir. 1999).

To the extent Rexnord is offering Sullivan's absences as an alternative ground for finding her unqualified under the ADA, Rexnord has not shown that a rational trier of fact could not find for Sullivan. The record does not indicate that Sullivan had erratic and unexplained absences. It is undisputed that Sullivan received one written warning for four unexcused absences between July 2008 and March 2009. (Plaintiff's Additional Facts ("PAF") ¶ 85.) Otherwise, Rexnord did not

-18-

discipline Sullivan for her health related absences. (*Id.*) Thus, Rexnord has not shown that Sullivan's absences from work make her unqualified under the ADA.

5.  *Adverse Employment Action Because of Disability*

Rexnord further argues that it did not terminate Sullivan "because of" a disability, but fired her because she posed a direct threat. Because the court has found summary judgment inappropriate on the issue of whether Sullivan is a direct threat, summary judgment is likewise inappropriate on the issue of whether Rexnord terminated Sullivan "because of" a disability.

6.  *Actual Disability of Migraines*

Rexnord argues the EEOC cannot meet its burden of proof in showing that Rexnord terminated Sullivan due to her actual disability of migraine headaches because the EEOC has not presented expert testimony to prove the alleged disability. Rexnord argues migraine headaches are not within the category of physical impairments within a jury's understanding. The ADA defines an actual disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). In addressing whether the EEOC was required to provide medical evidence of his or her substantial limitations to satisfy the terms of the ADA, the Seventh Circuit held that "[w]e do not read either the statute or our prior case law as imposing a requirement that the plaintiff provide medical testimony in all cases . . . ." *EEOC v. AutoZone, Inc.*, 630 F.3d 635, 643 (7th Cir. 2010). In so holding, the court considered cases in other contexts in which expert testimony was unnecessary to establish causation in cases where a lay person could understand an injury or condition. *Id.* at 644. In *AutoZone*, the claimant experienced onsets of debilitating pain, that included neck and back swelling, sweating profusely, and headaches which led to vomiting. *Id.* at 637. The court extended the reasoning of the cases in which lay persons

-19-

could understand an injury or condition to "the scope of a physical limitation like [claimant's] which is obvious to an observer and easily described by the sufferer." *Id.* at 644.

Although the court in *AutoZone* addressed whether expert testimony was necessary to prove the "substantial limitation" prong of the definition of disability, the reasoning is equally applicable to whether a plaintiff suffers from a physical impairment. This is not a situation as described in the case cited by Rexnord, *Simpson v. N.E. Ill. Reg'l Commuter R.R.*, 957 F. Supp. 136 (N.D. Ill. 1997) where the court found expert testimony was necessary to establish causation in a claim under the Federal Employer's Liability Act where an employee alleged he suffered from migraine headaches and panic attacks as a result of the railroad's negligence in exposing him to chemicals. In *Simpson*, the court stated that the causal relationship between chemical exposure and migraine headaches and panic attacks was not obvious to an ordinary citizen. *Id.* at 138. Conversely, whether Sullivan suffers from the physical impairment of migraine headaches is within the realm of understanding of the ordinary lay person. Sullivan has testified as to her symptoms regarding her migraine headaches (Sullivan Dep. at 66-67.) Further, the EEOC has presented evidence from Sullivan's treating physician, Dr. Adine Rodemeyer, regarding her migraine symptoms. (Deposition of Dr. Adine Rodemeyer "Rodemeyer Dep.," at 21-24, del Peral Decl. ¶ 37, Ex. JJ, Docket # 90-1.)

Thus, it is unnecessary for the EEOC to produce expert testimony to prove Sullivan suffered from migraine headaches and the jury will decide whether Sullivan suffered from a physical or mental impairment that substantially limits one or more major life activities.

Rexnord further argues that its direct threat defense applies with equal force to Sullivan's actual disability claim. For the reasons stated above, summary judgment on this issue is not appropriate. Finally, Rexnord argues Sullivan was not terminated because of migraine headaches,

-20-

but because of Dr. Seter's opinion based on Sullivan's description of her alleged seizure disorder. However, there is conflicting evidence in the record as to what impairment actually caused Sullivan's symptoms— a seizure disorder or migraine headaches causing blackouts. The EEOC has presented evidence in the form of Dr. Morris' expert report that Sullivan's "blackouts" were caused by migraine headaches. (Dr. Morris Expert Report at 2.) Further, Sullivan testified that she becomes dizzy and blacks out when her migraine headaches become severe. (Sullivan Dep. at 66-67.) Thus, a reasonable jury could conclude based on the evidence that Rexnord fired Sullivan because of her perceived disability of a seizure disorder, or because of her actual disability of migraine headaches, both of which could potentially cause her symptoms.

### 7. After-Acquired Evidence

Under the after-acquired evidence defense, an employee's misconduct may limit her recovery of damages. As the Seventh Circuit has explained: "[a]n employer may be found liable for employment discrimination, but if the employer later—typically in discovery—turns up evidence of employee wrongdoing which would have led to the employee's discharge, then the employee's right to back pay is limited to the period before the discovery of this after-acquired evidence." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047 (7th Cir.1999) (citing *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361 (1995)). While the law on this issue is clear that the discovery of after-acquired evidence can limit damages, what is unclear in this case are the underlying relevant facts.

First, it is undisputed that Rexnord had a policy in place prohibiting an employee from reporting to work under the influence of illegal drugs or in a state unfit to work. (DPFOF ¶ 127.) Sullivan's medical records indicate that when she left Rexnord on October 16, 2008 and was transported to the hospital by ambulance, her urine tested positive for Benzodiazepines and Cannabinoids. (Nigh Decl., ¶ 20, Ex. S, Docket # 69-19.) Sullivan testified that she "might have"

-21-

smoked marijuana a few weeks before October 16, 2008 and that she had taken her mother's medication the night before to help with stiffness in her neck. (Sullivan Dep. at 58.) Usher testified that she would have terminated Sullivan's employment on October 16, 2008 had she known Sullivan reported to work that day under the influence of marijuana and her mother's prescription tranquilizers. (Usher Decl. ¶ 11, Docket # 70.) While the EEOC does not dispute that Rexnord would fire an employee who reports to work under the influence of marijuana and tranquilizers, it disputes that Sullivan was actually under the influence of these drugs on October 16, 2008. (Pl.'s Resp. Def.'s PFOF ¶ 130.)

Rexnord's drug-free workplace policy does not define "under the influence." Rexnord does not produce evidence explaining this policy. Rather, Rexnord produced evidence that it fired an employee for being "under the influence" of alcohol who tested positive for having alcohol in his system in the amounts of 0.020 and 0.016. (Usher Decl. ¶ 10, Ex. D, DPFOF ¶ 129.) It is unclear from the facts presented what is necessary to violate the drug-free workplace policy. Does "under the influence" mean that an employee must have no illegal substance in her system at all, or does "under the influence" take into account whether the consumption of the substance impacts one's behavior, conduct, etc.? The inference from Usher's declaration, where the employee was terminated for having a small amount of alcohol in his system, is the former.[2] If the policy is, in effect, a zero tolerance policy, then Rexnord should prevail on this issue. If not, then there is an issue of fact as to whether Sullivan violated the policy, which makes summary judgment inappropriate.

Second, there is a dispute as to when Rexnord first discovered Sullivan's alleged violation. Rexnord states that it first discovered Sullivan's violation of its drug-free workplace policy on

---

[2]It should be noted that this employee also fell at his work station; however, it is unclear whether the fall was a result of his alcohol consumption.

-22-

December 19, 2011, the day when the EEOC first produced the medical records from her October 16, 2008 emergency room visit. ( DPFOF ¶ 131.) Rexnord cites to Exhibit Z of the Nigh Declaration in support of this fact. The EEOC disputes this fact by stating that "Rexnord's cited evidence does not support the proposed fact: the cited exhibit does not contain any medical records or test results. Exhibit Z is dated July 31, 2012." (*Id.*) While it appears Rexnord mistakenly interchanged Exhibits Z and AA of the Nigh Declaration, as it is Exhibit AA that contains an email from the EEOC transmitting its initial disclosures of certain medical records, the email still does not contain the actual medical records. While it lists the Bates numbers of certain medical records, it does not appear to contain the record in question, which is Bates stamped EEOC000637 elsewhere in the record. (Nigh Decl., Ex. S, Docket # 69-19, del Peral Decl., Ex. L, Docket # 86-6.) Thus, the evidence presented does not clearly indicate when Rexnord discovered Sullivan's alleged violation of its drug-free workplace policy. As such, Rexnord's motion for summary judgment on this issue is also improper.

## CONCLUSION

The record before the court indicates there are numerous disputes of material fact and Rexnord has failed to show that it is entitled to judgment as a matter of law. First, Rexnord has not shown it is entitled to summary judgment on the ground that Sullivan is not a qualified individual under the ADA. As to Rexnord's direct threat defense, Rexnord has not shown that the evidence is so one-sided that no reasonable jury could find for Sullivan. Regarding the representations Sullivan made to the Social Security Administration on her application for benefits, a jury must evaluate what the apparent inconsistencies mean for the ADA claim. Finally, regarding her absences from work, Rexnord has not shown that this makes Sullivan unqualified under the ADA.

-23-

Second, Rexnord argues that Sullivan was not terminated "because of" a disability, but because she was a direct threat. As the court found summary judgment inappropriate on the issue of whether Sullivan was a direct threat; summary judgment is likewise inappropriate on this issue as well. Third, summary judgment is inappropriate on the issue of whether Rexnord terminated Sullivan due to her actual disability of migraine headaches because a reasonable jury could conclude, based on the evidence, that Rexnord fired Sullivan because of her actual disability of migraine headaches. Finally, the court rejects Rexnord's motion for summary judgment on its after-acquired evidence defense because there are issues of material fact as to whether Sullivan violated Rexnord's drug-free workplace policy and as to when Rexnord first discovered Sullivan's alleged violation.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Defendant's Motion for Summary Judgment (Docket # 66) is **DENIED**.

**IT IS FURTHER ORDERED** that the clerk shall schedule an in-court scheduling conference with the parties to discuss scheduling this matter for trial. The parties are to confer regarding proposed trial dates prior to the conference.

Dated at Milwaukee, Wisconsin this 30th day of August, 2013.

BY THE COURT:

_s/Nancy Joseph_
NANCY JOSEPH
United States Magistrate Judge

-24-